JACKS VS. ADAIR.

1. HUSBAND AND WIFE:

The husband becomes the absolute owner of the wife's legacy, and may dispose of it.

2. EXECUTOR:

An unauthorized settlement with the executor and acquittance of record in the Probate Court, by one who professes to have, but is, in fact, without authority to represent a legatee in regard to the legacy, is not binding, and will be set aside, and the amount due the legatee decreed him in equity.

CROSS APPEALS from *Lee* Circuit Court in Equity.

Hon. W. W. SMITH, Special Judge.

*Garland & Cockrill, Tappan & Hornor,* for appellant.

*Brown* and *Thweatt, contra.*

HARRISON, J.:

This was a suit in equity by Mary Ellen Adair, and Martha Griffin, as administratrix of Benjamin F. Griffin, against Eli T. Diamond, Thomas M. Jacks and James Adair.

The complaint, in substance, alleged that Dennis Griffin, a resident of Phillips County, died in 1848, leaving a will by which he emancipated his negro woman Nancy and her four children, Mary Jane, Frank, afterwards known as Benjamin F. Griffin, Mary Ellen, the plaintiff, Mary Ellen Adair, and Farris Cunningham, and gave to the said children his plantation, then in Phillips, now in Lee County, slaves, stock, farming utensils and household furniture, which property he directed to be kept together, and the plantation carried on, for six years, from the profits of which the said legatees were, in the meantime, to be supported and educated, and at the expiration of that time the whole to be sold, and the proceeds to be divided equally among them. And Eli T. Diamond and Hardy H. Borland were appointed executors.

That Mary Jane and Farris Cunningham died in infancy, and without issue, and that the said Mary Ellen and Benjamin F. Griffin were their next of kin, and that Mary Ellen intermarried in 1861 with the defendant, James Adair.

That Diamond, only, proved the will and qualified as executor; afterwards, in 1859, his bond was adjudged insufficient by the Probate Court, and he was required to give a new one, in the sum of $50,000, which he did, with the defendant, Thomas M. Jacks, Boyd Bailey and Jesse A. Jackson as his sureties; and that said Bailey and Jackson, the former of whom was dead, had become insolvent, and been discharged from their debts, in bankruptcy.

That the whole of the property devised was sold by the executor, but not until the 1st day of January, 1861; that the plantation, which contained 309.11 acres, and was worth $25 an acre, and the annual rent, from $1,800 to $2,000, was, by a fraudulent contrivance between the executor and Jacks, sold to the latter for $4 an acre, and that Jacks at once entered into and had ever since retained possession of it.

That, at the January term, 1868, of the Probate Court, Diamond's final settlement as executor was confirmed, and there was found in his hands, belonging to the legatees, the sum of $15,-024.83; that he the same day filed, as an acquittance of the same, the following receipt:

Received of Thomas M. Jacks, Boyd Bailey and Jesse A. Jackson, securities of Eli T. Diamond, as executor of Dennis Griffin, deceased, the sum of $15,000, the amount found to be due from said executor to said estate, the said sum being paid in property and money, and is in full of all demands against said Diamond as such executor, except clerk's costs.

We sign this for ourselves, and as attorneys in fact, of Frank Griffin, whose interest in said estate we represent:

*Attest:*                    JAMES ADAIR,

                             J. C. TAPPAN,

                             MARY ELLEN (her X mark) ADAIR,

                             JOHN P. MOORE,

                             FRANK GRIFFIN.

By his attorney in fact.

                                           JAMES ADAIR.

And that the court the same day allowed the said receipt as a full satisfaction of said sum of $15,024.83, and released and discharged Diamond from his executorship.

That the receipt was procured by the artifice of Jacks, who, so soon as the amount of Diamond's indebtedness was ascertained, set about extricating himself from his liability as surety, and to that end employed the assistance of one John P. Moore, who negotiated and brought about, with James Adair, who assumed to act for his wife and Benjamin F. Griffin, as well as for himself, a compromise of the legatee's claim, the terms of which are shown in the following agreement between Moore and said Adair:

"This agreement, made and entered into this 12th day of February, 1868, by and between James Adair and Mary Ellen Adair, his wife, for themselves, and for Frank Griffin, as legatees of Dennis Griffin, deceased, of the one part, and John P. Moore of the other part, witnesseth: That, for and in consideration that said first parties have this day executed a receipt to Thomas M. Jacks, Boyd Bailey and Jesse A. Jackson, as securities of Eli T. Diamond, executor of said Dennis Griffin, deceased, for the sum of $15,000, the amount found to be due from said executor to said estate, and for the further consideration of $1 to said second party, by said first party, in hand paid, at and before the

signing and ensealing hereof, the receipt of which is hereby ac-
knowledged ; said second party hereby agrees and binds himself
to convey to said legatees, within ten days from this date, a good
and perfect title to the farm on the St. Francis River, in the
county of Phillips and State of Arkansas, purchased by said sec-
ond party from Charles Roberts, containing 120 acres ; and, also,
160 acres out of any land owned by said second party, to be des-
ignated by said first parties in secs. 22, 27 and 18, or either of
them, in township 1 north, range 4 east, west of river ; and, also,
to give to said first parties one horse, one two-horse spring
wagon and harness, $30 in money, and $190 in provisions and
corn, at cash prices, reserving and securing to Hindman and
Sanders a lien upon all of said property, to be conveyed by said
second party, as aforesaid, to secure their fee as attorneys for said
legatees, as per written agreement with said James Adair.

In testimony whereof, the said James Adair and Mary Ellen
Adair, his wife, by and for themselves, and the said James Adair,
as attorney in fact, for said Frank Griffin, and the said John P.
Moore, by and for himself, have hereunto signed their names
and affixed their seals, on the day and year first above written.

| Attest : | JAMES ADAIR, | [L.S.] |
| | JOHN J. HORNOR, | [L.S.] |
| | MARY ELLEN (her X mark) ADAIR, | [L.S.] |
| | W. H. GOVAN, | [L.S.] |
| | FRANK GRIFFIN. | [L.S.] |

By his attorney in fact.

JAMES · ADAIR, [L.S.]

And, that though it appear by said receipt and agreement, that
Benjamin F. Griffin was a party thereto, and it also appears, by
the orders of the Probate Court, relating to the filing of the re-
ceipt, its allowance as evidence of the payment and satisfaction
of the sum due from Diamond, and his release and discharge

from his executorship, that he was represented by attorney, he was not, in truth, a party to any of the proceedings; that he was then a resident of Ohio, and not at the time in the State, and knew nothing of the matters, and that James Adair, who assumed to be such, was not his agent or attorney, and had no authority whatever to act for or represent him in the matter of his legacy, and that he had not retained or employed any attorney to appear for and represent him in the Probate Court in regard thereto.

That the said Mary Ellen Adair, who was illiterate and unable to read, was deceived and imposed upon by her husband, who told her that the property they were to get from Moore was only a payment on the legacy of $1,500, consented to and signed the agreement and receipt in ignorance of their real purport and effect, and if truly informed thereof, would not have done so.

That the value of the farm, or Charles Roberts place, did not exceed $1,500, the annual rent of which was about $150; and all the property they were to get from Moore was not worth more than $1,800 or $2,000.

That James Adair received from Moore the money and personal property, and, soon after the compromise, moved, with his family, on the farm, and was then in possession of it, but that Moore had never, as he covenanted to do, conveyed the title to the same, or to the 160 acres.

That Jacks never paid for the plantation, or any part of the purchase money; but that Diamond had, on the 12th of February, 1870, two years after his discharge, conveyed the same to him.

And that Benjamin F. Griffin died intestate, in Ohio, after the final settlement and discharge of Diamond, and administration on his estate was granted, in that State, to his widow, Martha Griffin.

The prayer was that the conveyance of the plantation to Jacks be cancelled and set aside, and the title vested in the plaintiff; that Jacks account for and pay them the rents and profits since his purchase; that the compromise, and the order of the Probate Court crediting Diamond with the receipt, and discharging him as executor, be set aside; and that Diamond and Jacks, after being credited with the money and the value of the personal property received from Moore, and the rents and profits of the farm, which they offer to account for, be decreed to pay them the moneys in the hands of Diamond at the confirmation of his final settlement, with interest from the date of the settlement, and that the share, or portion, of the plaintiff, Mary Ellen Adair, be settled on her to her separate use.

Jacks, in his answer, which Diamond adopted as his also, denied the alleged fraud in the purchase of the plantation, or that it was worth any more than he gave for it, or that there had been any rents or profits, the land being wild, he said, with no improvements on it, except a few cabins. He denied, also, the allegation that he had not paid for it, and averred that he had paid the whole of the purchase money, and Diamond had accounted for the same in his settlements. He admitted that Diamond had not made him a deed until after his discharge from his executorship, but said that Dennis Griffin had but an equitable estate in it, and at the time of his death the legal title was in Diamond. He denied that any improper means were used to effect the compromise with the legatees, or that he employed John P. Moore to procure it, or that it was made through Moore's agency; on the contrary, he said James Adair and his wife were anxious for a compromise, and sedulously sought it; Diamond and his co-sureties, Bailey and Jackson, were already bankrupts, and he was determined, if no compromise was made, to go himself into

bankruptcy; that Diamond offered to convey to them his planta-
tion on the Mississippi River, which he, Jacks, wished and ad-
vised them to accept, but they preferred and wished to own the
farm on the St. Francis River, that Moore had purchased from
Charles Roberts, and so Diamond proposed to Moore to convey
to him the plantation, if he would let them have the farm, and
pay them the difference in value in the two places, which arrange-
ment was made, and was perfectly satisfactory to both Adair and
his wife.

He denied that James Adair had no authority to act for Ben-
jamin Griffin, and averred that he was, as he represented and held
himself out to be, his agent and attorney in fact, and denied that
Benjamin F. Griffin was not represented, as alleged in the com-
plaint, by attorney in the Probate Court, where Diamond was
credited with the receipt, and discharged; and he admitted that
Moore had not conveyed the lands, according to his covenant,
but said the 160 acres had not been selected, but that Moore was
willing and ready, and would convey them when that was done.

James Adair made no defense.

The decree of the court was that the order of the Probate
Court, releasing and discharging Diamond, so far as it related to
Benjamin F. Griffin's legacy, or portion of the estate, be set
aside, and that Diamond and Jacks pay to Martha Griffin, as
administratrix of Benjamin F. Griffin, $3,756.20, one-fourth of
the amount found due the legatees upon the final settlement, with
interest from that date; and that Jacks convey the lands that
Moore covenanted to convey, to Mary Ellen Adair, for her sepa-
rate use, so soon as the 160 acres should be selected, and directed
the selection to be made by James Adair.

The plaintiffs and Diamond and Jacks appealed.

The plaintiffs offered no evidence in support of the allegation,
in their complaint, of fraud in the sale of the so-called planta-

tion; and the evidence on the part of Diamond and Jacks very clearly showed that it had no cleared land or improvements of any value on it; and that it was sold for its full value, and the purchase money had been paid, and the same accounted for by Diamond in his settlements.

Nor does it appear that the compromise was induced by any misrepresentation or fraud practiced upon the Adairs; but it was shown that both were very desirous to effect it; and that Mary Ellen herself was particularly active and persistent in having it consummated, and had a perfect understanding of it.

Nor can we think in view of all the circumstances, the condition of the country, and the general bankruptcy that followed the war—Diamond and two of his sureties, already bankrupts—and Jacks on the point of filing his petition, for he swears, he should have done so, if the compromise had not been effected—that it was not a fair and just one; or that they did not get as much by it, as they would if they had sued Diamond and his sureties.

There was no such relation of trust and confidence between Diamond, the executor, and James Adair, as is claimed by counsel, in regard to the wife, as forbade any dealing between Diamond and him in respect to her legacy, and it was not pretended, that he did not understand the compromise, or was influenced by any improper means to make it; and as the husband of Mary Ellen, he was absolute owner of her legacy, and might make any contract concerning it, he chose, even to the release of the whole of it.  Schoul. Dom. Rel., 113; 2 Kent. Com., 135. The contract of James Adair was therefor valid and binding, and his acquaintance released Diamond and his sureties, as to his wife's interest in the estate.

The evidence as to the agency of James Adair for Benjamin F. Griffin, is somewhat conflicting.  It was proven that Hindman

& Sanders were employed by him, as attorneys, to look after and attend to the interests of the legatees.

Sanders, one of them, testified for the defendants, that when Adair retained them, he showed them what purported to be a power of attorney from Griffin to him, to act for him in the matter of his legacy, but which was defective in some particular, but in what he could not distinctly remember; that he wrote and enclosed it to a lawyer, whose name Adair gave, in the town in Ohio, in which Griffin lived, with request to have the defect, whatever it was, corrected, and it returned to him. That he received no answer to his letter, and Adair, afterwards, told him he had made a mistake in the address, and gave the name again, and he again wrote, according to this last direction, but never received an answer, nor was the power of attorney ever returned.

He did not remember any express authority in it to compromise his claim, but believed, if not expressed it was implied. That not doubting the authenticity of the instrument, or Adair's authority to employ counsel for Griffin, they appeared and attended to the matter for him, as well as for Adair and his wife.

James Adair testified for the plaintiffs: That he never had from Griffin a power of attorney; but that he showed Gen. Hindman, when he employed him and Sanders, a contract between himself and Griffin, by which Griffin agreed to sell him his interest in the estate for $550, which Gen. Hindman said amounted to nothing; but he took it to send to Griffin to be fixed up. The contract was made two years before, and was to be void if the money was not paid in six months, and he had never paid anything on it.

The evidence leaves in doubt the real character of the instrument exhibited to Hindman & Sanders. We cannot, however think that it was a valid power of attorney, for if such, why

should it have been returned? If designed for a power of attorney, and it reached Griffin, and the probabilities are that it did, his failure to return it, it is reasonable to suppose, was because he chose to revoke it. The preponderance of the evidence seems to be in favor of the finding of the court below, that Adair had no authority to act for Griffin.

The order of the Probate Court, so far as it related to Griffin's legacy or interest in the estate, was therefore properly set aside, and Diamond and Jacks decreed to pay his administratrix, one fourth of the amount shown by the final settlement to be due, with interest from the date of the settlement.

If the plaintiffs take, as next of kin, the shares of the two legatees who died in infancy, which the complaint, by no means makes apparent; and upon which question we shall express no opinion, the interest of Mary Ellen Adair and her husband in them, was included in, and released by, the compromise, and they cannot now assert a claim to it; and that of Griffin's representatives can be recovered, only by administrations upon their estates, as held in *Lemon's heirs* v. *Rector*, 15 Ark., 437; *Pryor* v. *Reyburn*, 16 Ark., 671; *Anthony* v. *Peay*, 18 Ark., 24; *Atkins* v. *Guice*, 21 Ark., 164.

The title to the lands Moore covenanted to convey, the pleadings show to have been in him, at the commencement of the suit; but it appearing by the evidence that they have since been conveyed to Jacks, the court below, therefore, very properly directed him to make the conveyance. Gantt's Digest, sec. 4611.

Diamond and Jacks may have supposed, and most probably did, that they were getting, in the compromise, a settlement and release of Benjamin F. Griffin's share; it, however, plainly appears, that the value of the property they paid, was much less than the legacy or share of the Adairs, and they filed no cross-complaint, and did not ask a rescission of the contract.

The decree is affirmed.